IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

MICHAEL R. DYE,

      Plaintiff,

v.                                 CASE NO. 6:09-cv-00095

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Michael Ray Dye (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on June 10, 2005, alleging disability as of January 1, 2003, due to left arm and shoulder impairments, carpal tunnel syndrome and back and hip pain.  (Tr. at 98.)  For DIB purposes, Claimant's insured status expired on December 31, 2007.  (Tr. at 17.)  The claims were

denied initially and upon reconsideration.  (Tr. at 71-75, 77-79, 80-82.)  On March 2, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 83.)  The hearing was held on August 23, 2006, before the Honorable James Toschi.  (Tr. at 61-68.)  The ALJ continued the hearing to collect additional evidence, and conducted a second hearing on February 6, 2007.  (Tr. at 31-60, 61-68.)  By decision dated March 29, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 16-27.)  Claimant submitted additional evidence to the Appeals Council, and on December 4, 2008, the Appeals Council determined that the additional evidence did not provide a basis for changing the ALJ's decision.  (Tr. at 5-8.)  On February 4, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R.

2

§§ 404.1520, 416.920 (2007).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work

3

experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 18.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of left shoulder tendonosis and learning disorder. (Tr. at 19-21.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21.)  The ALJ then found that Claimant has a residual functional capacity for medium work, that Claimant would be limited to less than frequent reaching in all directions with his left (non-dominant) upper extremity, that Claimant would be limited to understanding, remember and carrying out simple instructions and tasks only and that he should have only occasional contact with the public. (Tr. at 23.)  As a result, Claimant cannot return to his past relevant work. (Tr. at 25.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as dishwasher, janitor and stock clerk, which exist in significant numbers in the national economy. (Tr. at 26.)  On this basis, benefits were denied. (Tr. at 27.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In _Blalock v. Richardson_, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

_Blalock v. Richardson_, 483 F.2d 773, 776 (4th Cir. 1972) (quoting _Laws v. Cellebrezze_, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   _Hays v. Sullivan_, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   _Oppenheim v. Finch_, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was forty-seven years old at the time of the second administrative hearing.  (Tr. at 35.)  Claimant completed the ninth grade and testified that he could read and write "some."  (Tr. at

37.)  Claimant testified that he could read a newspaper and sign his name.  (Tr. at 37.)   In the past, Claimant worked as a farmhand, in the oil fields, and mowing lawns.  (Tr. at 39-40.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant does not suffer from a condition that meets the Commissioner's listing of impairments, in particular Listing 12.05C.  (Pl.'s Br. at 8-13.)

The Commissioner argues that Claimant did not meet Listing 12.05C because he did not prove that he had deficits in adaptive functioning before the age of 22.  The Commissioner further asserts that he met his burden of producing evidence that work existed in the economy that Claimant could perform.  (Def.'s Br. at 10-14.)

In reply, Claimant distinguishes the unpublished cases cited by the Commissioner and argues that there is evidence of significant deficits in adaptive functioning from two examining psychologists.  (Pl.'s Reply at 1-3.)

Claimant testified that he attended school through the ninth grade and was enrolled in special education in Wirt County, West

6

Virginia.[1]  (Tr. at 37.)  By letter dated September 19, 2006, the special education coordinator for Wirt County Schools stated that the school did not have any special education records for Claimant. (Tr. at 161.)  By letter submitted to the Appeals Council, a counselor at Wirt County High School stated that the permanent record for Claimant was not located.  (Tr. at 373.)

Claimant testified that he was able to read and write "some" and could read a newspaper and sign his name.  (Tr. at 37.) Claimant worked for several years as a laborer.  He worked as a farmhand alongside his father and on an oil and gas rig where his brother-in-law hired him.  (Tr. at 40.)

Claimant underwent two consultative psychological examinations, one at the request of his counsel, and the other at the request of the State disability determination service.

On March 10, 2006, Janice Blake, M.A., supervised by Timothy S. Saar, Ph.D.[2], conducted a consultative mental examination at the request of Claimant's then counsel.  Claimant reported "problems coping with daily life, stating that his wife was in charge of everything."  (Tr. at 332.)  Claimant reported that he completed the ninth grade and quit during the tenth grade.  Claimant reported

---

[1]  Claimant also stated on a Disability Report - Adult that he attended school through the eleventh grade.  (Tr. at 103.)  On other forms, he stated that he was "not very good with adding or paying bills (sending them out) [and] only went to 9th grade in school." (Tr. at 138.)

[2]  Claimant testified at the administrative hearing that he was only examined by Ms. Blake.  (Tr. at 47-48.)

that he was retained in the third grade and provided a tutor in math after a hospitalization for asthma and pneumonia during that year. (Tr. at 334.)  On the WAIS-III, Claimant attained a verbal IQ score of 65, a performance IQ score of 64 and a full scale IQ score of 62.  During testing, Claimant became very anxious and stuttered and searched for words, "often using the wrong word, which resulted in test scores being lower than would be expected if the client had not done so." (Tr. at 336.)  Ms. Blake observed however, that this

> correlates with his self-report of action when around others.  His highest scores were noted to be in Digit Span and Letter-Number Sequencing.  These subtests measure attention, short term memory, concentration, tracking, and set shifting.  Other subtest scores are consistent overall, although the client did have problems finding words and would often say the wrong words during test administration.  His obtained scores correlate with his work history as he reported that he had done farm work beginning at age 16 years, that lasted approximately 28 years.  He stated that he had only worked four to five months on an oil rig prior to quitting.  His other employment has been mowing lawns and other lawn care.  This would be consistent with an individual who falls within the mild mental retardation range of intellectual functioning.

(Tr. at 336.)

On the WRAT-3, Claimant was reading on a fifth grade level, spelling on a second grade level and doing arithmetic on a sixth grade level. (Tr. at 336.)  The results were "considered valid for the same reason the IQ scores are considered valid." (Tr. at 337.)

Ms. Blake diagnosed panic disorder with agoraphobia and adjustment disorder with depressed mood on Axis I and mild mental retardation on Axis II.  Claimant's GAF was 50. (Tr. at 337.)

8

Ms. Blake completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment and opined that Claimant was markedly limited in several areas. (Tr. at 339-42.)

On October 1, 2006, John R. Atkinson, Jr., M.A., a licensed psychologist, examined Claimant at the request of the State disability determination service. He noted that MMPI-II was requested but not completed because of Claimant's full scale IQ of 68. (Tr. at 363.) Claimant was noted to be "quite alexithymic and had considerable difficulty conceptualizing and expressing his feelings." (Tr. at 365.) Claimant reported that he attended school through the ninth grade and quit school at age sixteen. He had a poor attendance record, repeated the third grade and was in special classes. He reported making average to below-average marks. (Tr. at 366.) Claimant reported he had problems reading labels and directions, but could make small change and knows how to write checks. (Tr. at 366.) Claimant reported that "on the job he never had to do any reading or writing, but did operate machinery like tractors, bailing machines and 'farm stuff.'" (Tr. at 366.) Claimant had a verbal IQ score of 70, a performance IQ score of 72 and a full scale IQ score of 68. (Tr. at 366.) Mr. Atkinson stated that the scores were valid due to average effort. He wrote that Claimant had a fourth grade literacy level, was in special education and that "[o]nset is presumed to be before age

9

22, as manifested by special education placement." (Tr. at 367.)

On the WRAT-3, Claimant was reading on level 4.7 and doing arithmetic on level 3.6. These scores also were valid. (Tr. at 367.) Mr. Atkinson diagnosed adjustment disorder with depressed mood and rule out attention-deficit/hyperactivity disorder combined type on Axis I and mild mental retardation on Axis II. He wrote that the mild mental retardation diagnosis was "manifested by valid WAIS-III Verbal IQ of 70, Performance IQ of 72, and Full Scale IQ [of] 68, 4th grade reading and 3rd grade math." (Tr. at 370.) He further opined that if granted benefits, Claimant would not be able to manage them on his own. (Tr. at 370.)

Mr. Atkinson completed a Medical Assessment of Ability to do Work-Related Activities (Mental) and opined that Claimant had a poor ability to maintain attention and concentration and understand, remember and carry out complex job instructions. (Tr. at 360-62.)

At the administrative hearing, Claimant called Dr. David Blair to testify about Claimant's mental impairments. Regarding Claimant's intellectual functioning in particular, Dr. Blair testified that Claimant's IQ scores of 65, 64 and 62 as tested by Ms. Blake were a "statistical anomaly" because the full scale IQ score was lower than the other two. (Tr. at 49.) Dr. Blake explained that Claimant's working memory index was 78, "which is substantially higher and indicates an ability to attend and

10

concentrate in the moment, short-term memory." (Tr. at 49.) When asked if these scores were valid, Dr. Blair noted that Claimant attained higher scores the "next time," presumably referring to testing by Mr. Atkinson. (Tr. at 50.) Dr. Blair testified that he could not "find evidence that [Claimant] was not capable of taking care of himself." (Tr. at 50.)

Regarding the IQ scores on testing conducted by Mr. Atkinson, Dr. Blair testified that despite these scores, he "believe[d] that the rest of the record indicates that he was likely able to do better than that." (Tr. at 51.) Dr. Blair pointed out that for IQ tests, "we don't actually have real indicators of effort in any of these tests." (Tr. at 52.) Dr. Blair opined that Claimant was "probably operating [i]n the borderline intellectual functioning area. We don't know about special education placement. It was reported once, not reported the other time. Don't have evidence of deficits in adaptive functioning or in vocational functioning. So that does not speak to mental retardation, based on the record we have here." (Tr. at 52.) Dr. Blair opined that Claimant could not perform complex job instructions. (Tr. at 53.)

Upon questioning from Claimant's counsel, Dr. Blair conceded that he did not have enough information in the record without the school records to make a diagnosis of mental retardation. (Tr. at 55.)

In his decision, the ALJ found that Claimant had severe left

11

shoulder tendonosis and a learning disorder.  (Tr. at 19.)  The ALJ
summarized the evidence of record from Ms. Blake and Mr. Atkinson
and noted that they both diagnosed mild mental retardation.  (Tr.
at 20.)  He stated that Ms. Blake "noted that the claimant was
anxious during the intelligence testing, which raises question as
to the validity of the results (Exhibit 13-F)."  (Tr. at 20.)  The
ALJ determined that Claimant has moderate difficulty in maintaining
concentration, persistence and pace.  (Tr. at 21.)

The ALJ rejected Ms. Blake's opinion on the assessment she
completed because her opinion "was based on the claimant's own
subjective complaints; and he has not been found totally credible
as discussed further in the decision."  (Tr. at 22.)  In addition,
the ALJ found that Claimant never received mental health treatment,
had not been prescribed psychotropic medications and the degree of
functional limitations assessed by Ms. Blake was not substantiated
by her own mental status examination.  (Tr. at 22.)

The ALJ noted Dr. Blair's testimony and stated that

[t]he validity of the claimant's intelligence testing is
questionable due to his reported anxiousness during
testing (Exhibit 13-F).  Furthermore, the claimant later
attained IQ's in the 70's (Exhibit 17-F).  In Dr. Blair's
opinion, the claimant could possibly have scored higher
on his intelligence testing.  Dr. Blair testified that
the evidence does not reflect that the claimant meets or
equals Section 12.05 of the listings of impairments.  Dr.
Blair testified that in his opinion, the claimant could
perform simple job instructions and tasks and would be
limited to moderate stress.  The undersigned accepts the
testimony of Dr. Blair.

(Tr. at 22.)

12

The ALJ does not explain the weight afforded the findings of Mr. Atkinson.

The ALJ further found that Claimant's

> learning disorder has been evaluated under Section 12.00, which requires a severity that satisfies both the "A" and "B," or "C" criteria.  Therefore, the evidence reveals that there is no record by any treating or examining physicians or psychologists that they have identified findings equivalent in severity to the criteria of the listings of impairments.

(Tr. at 22.)

In evaluating Claimant's credibility, the ALJ noted Dr. Blair's testimony about inconsistencies in the record related to Claimant's mental condition, including that despite Claimant's complaints of depression, he had received no ongoing mental health treatment.  The ALJ further observed that

> the claimant's activities of daily living and work history are inconsistent for someone with a disabling mental condition.  The record does not reflect any problems with the claimant's reliability and job performance. He performed his farming job for 28 years. There was no indication in the record that the claimant would have any problems performing work without direct supervision (Exhibit 16-F).  The claimant can perform some reading and writing.  He reported that he reads the newspaper and can sign his own name.  The claimant was able to perform his prior work without any noted difficulties in communication or social functioning. Therefore, the undersigned concludes that the record does not demonstrate that the claimant would have any deficits in adaptive functioning initially manifested during his development period as required by the definition set forth in Section 12.05 of the listings of impairments. (Tr. at 24.)

The ALJ ultimately limited Claimant to medium work and further found that he was limited to less than frequent reaching in all

13

directions with this left, non dominant upper extremity, that he would be limited to understanding, remembering and carrying out simple instructions and tasks only and that he should have occasional contact with the public. (Tr. at 23.)

The court proposes that the presiding District Judge find that the ALJ erred in failing to find that Claimant meets Listing 12.05C. As such, the ALJ's decision is not supported by substantial evidence and should be reversed and remanded for an award of benefits.

In order to meet the criteria of Listing 12.05C, the regulations require that Claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2007); see also § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria). Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2007).

14

Mental retardation is a life long condition and "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant." <u>Luckey v. United States Dep't of Health & Human Servs.</u>, 890 F.2d 666, 668 (4th Cir. 1989) (citing <u>Branham v. Heckler</u>, 775 F.2d 1271, 1274 (4th Cir. 1985)).

In <u>Luckey</u>, the Fourth Circuit held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. <u>Id.</u> at 669. A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c) (2007). In <u>Luckey</u>, the Court ruled that

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C. Further, the [Commissioner] has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The [Commissioner's] finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

<u>Luckey</u>, 890 F.2d at 669.

Claimant is correct in his assertion that the ALJ does not fully analyze Claimant's impairments under Listing 12.05C in particular. However, when cobbled together, as cited above, it is clear that the ALJ concluded that Claimant did not meet Listing 12.05C. This finding is in error and not supported by substantial evidence.

There is no question that Claimant meets the second prong of Listing 12.05C in that the ALJ determined that Claimant's left shoulder tedonosis was a severe impairment. (Tr. at 19.)

As to the first prong of Listing 12.05C, Claimant's valid IQ scores, based on testing on two separate occasions, fall within the range required by Listing 12.05C. In testing conducted by both Ms. Blake and Mr. Atkinson, Claimant had IQ scores in the 60s. The ALJ sidesteps this issue by relying on the testimony of Dr. Blair, rejecting outright the testing by Ms. Blake because Claimant was "anxious" (Tr. at 20), and mentioning that testing by Mr. Atkinson showed "IQ's in the 70's" (Tr. at 22).

In fact, Mr. Atkinson found that Claimant had a full scale IQ score of 68, and the regulations specifically state that "where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D(6)(c) (2007). Mr. Atkinson, who examined Claimant at the request of the State disability determination service, also stated that Claimant's IQ scores were "felt to be valid, due to average effort." (Tr. at 367.) The ALJ never specifically explains the weight afforded the full scale IQ score found by Mr. Atkinson, nor does he explain the weight afforded Mr. Atkinson's opinion that Claimant was mildly mentally retarded.

Ms. Blake, whose testing showed that all of Claimant's IQ

16

scores were in the 60s, noted Claimant's anxiousness, but found the scores to be valid.  While Ms. Blake acknowledged that Claimant's test scores were lower than expected because of his stuttering and inability to find the right word, she also stated that the scores were valid (Tr. at 337), particularly because of Claimant's work history, which "would be consistent with an individual who falls within the mild mental retardation range of intellectual functioning" (Tr. at 336).  Ms. Blake went on to note that Claimant's WRAT-3 scores, showing functioning on the fifth grade level for reading, second grade level for spelling and sixth grade level for arithmetic, were valid for the same reasons.  (Tr. at 337.)

Ms. Blake and Mr. Atkinson are examining sources who administered objective testing they deemed valid, and as such, their consistent opinions are entitled to more weight than the opinion of Dr. Blair, a nonexamining source.  20 C.F.R. §§ 404.1527(d)(1) and 416.927(d)(1) (2007) (more weight is given to an examiner than to a nonexaminer).  An ALJ may not rely on the opinion of a nonexamining physician such as Dr. Blair when it is contradicted by all the other evidence of record.  Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974) ("a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in

the record"). Stated differently, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." <u>Smith v. Schweiker</u>, 795 F.2d 343, 346 (4th Cir. 1986).

The ALJ essentially rejects the valid scores found by Ms. Blake and Mr. Atkinson based on his own nonmedical opinion and the opinion of Dr. Blair, who never administered his own testing or examined Claimant, but felt that Claimant "could have possibly scored higher on his intelligence testing." (Tr. at 22.) Dr. Blair's hypothesis simply is not consistent with the substantial evidence of record from Ms. Blake and Mr. Atkinson. The ALJ's reliance on Dr. Blair's hypothesis is not consistent with the regulations and caselaw cited above, which clearly indicate an ALJ cannot rely on the opinion of a nonexamining source when it is inconsistent with the remaining evidence of record.

Turning to the issue of whether Claimant meets the introductory language of 12.05C, which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22," 20 C.F.R. Subpt. P, App. 1, § 12.05 (2007), the ALJ concluded that Claimant did not satisfy this requirement because (1) the record does not reflect any problems with reliability and job performance; (2) Claimant can perform some reading and writing (he reported that he reads the newspaper and

18

can sign his own name); and (3) the Claimant was able to perform his prior work without any noted difficulties in communication or social functioning.  (Tr. at 24.)

As noted above, mental retardation is considered a life long condition and "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant." Luckey, 890 F.2d at 668.  Furthermore, the ALJ "may not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met: 'When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'" Luckey, 890 F.2d at 669 (quoting Murphy v. Bowen, 810 F.2d 433, 438 (4th Cir. 1987)).

Claimant testified that he was in special education while in school (Tr. at 37), but at other times stated that he did not attend special education classes (Tr. at 103).  While some evidence indicates Claimant was not enrolled in special education, other evidence, including the letter from Wirt County Schools submitted to the Appeals Council, indicates Claimant's school records could not be located to verify this.  (Tr. at 161, 373.)  Mr. Atkinson determined that Claimant "had a 4th grade literacy level and was in special education.  Onset is presumed to be before age 22, as manifested by special education placement."  (Tr. at 367.)  Ms. Blake does not opine on this specifically in her decision, but she

19

does state that Claimant attended school through the ninth grade, was retained in the third grade and was provided a tutor after he was hospitalized for asthma and pneumonia and that he quit school at age sixteen to go to work.  (Tr. at 334.)

Mr. Atkinson, who examined Claimant at the request of the State disability service, explicitly stated that Claimant's onset occurred before age 22, and findings by Ms. Blake suggest this conclusion as well.  Despite the ambiguous evidence of record related to whether Claimant was in special education, the substantial evidence of record supports a finding that Claimant's mild mental retardation has been a lifelong condition.  Claimant dropped out of high school, worked as a farm hand in a family supported situation for most of his working career and those who examined him gave every indication that this was a lifelong condition.

Finally, the court finds the Commissioner's reliance on the unpublished cases cited in his brief to be unhelpful, as the determination of whether a particular claimant meets the requirements of Listing 12.05C is very case specific. Nevertheless, those cases can be distinguished.  In Mann v. Astrue, No. 5:07-00201, 2008 WL 906346, at *11 (S.D. W. Va. March 31, 2008), the claimant in that case had an IQ of 77 and did not allege

20

that he had significant deficits in adaptive functioning.[3]  In Rogers v. Astrue, No. 1:07-00626, 2009 WL 750235, at *12-13 (S.D. W. Va. March 20, 2009), the claimant did not have an additional severe impairment and, more importantly, she was able to function adaptively at a higher level relative to her IQ scores and, importantly, one examining source, who found IQ scores within the required range, also found that Claimant's day-to-day living skills showed a higher level of functioning.

Finally, in Hatfield v. Astrue, 5:07-cv-00267[4], at least one examining medical source opined that while claimant's IQ scores were in the 60s, the claimant's actual abilities fell within the lower average range of intellectual functioning (rather than in the mildly mentally retarded range) and that depression interfered with performance.  (# 13-2, p. 21.)

In the instant matter, two examining sources, one referred by the State disability determination service, found valid IQ scores in the 60s and opined that Claimant was mildly mentally retarded. The source referred by the State disability determination service, Mr. Atkinson, opined that Claimant's condition existed before age

---

[3]  The Commissioner refers to the claimant in this case as a female and states that she had IQ scores between 60 and 70, dropped out of school when she was fifteen because she was pregnant and was capable of caring for and raising four children.  The Commissioner appears to be discussing a case different from the one cited in and appended to his brief.  (Def.'s Br. at 13.)

[4]  The Commissioner did not attach this decision to his brief, and the case is cited incorrectly, but the Claimant attached it to his reply.

twenty-two and evidence from Ms. Blake and Claimant's own testimony support this finding as well.  As such, Claimant meets Listing 12.05C and is entitled to benefits as of the date of his alleged onset of disability on January 1, 2003.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge REVERSE the final decision of the Commissioner, REMAND this case for an award of benefits pursuant to the fourth sentence of 42 U.S.C. § 405(g) and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation, within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a

22

waiver of appellate review by the circuit court of appeals.  Snyder
v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn,
474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th
Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.
1984).  Copies of such objections shall be served on opposing
parties and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and
Recommendation and to transmit a copy of the same to counsel of
record.

February 25, 2010
        Date

Mary E. Stanley
United States Magistrate Judge

23